**ASU Sandra Day O'Connor College of Law**
**First Amendment Clinic, Public Interest Law Firm**
Gregg P. Leslie, Gregg.Leslie@asu.edu,* (AZ Bar # 035040)
Aaron A. Baumann, Aaron.Baumann@asu.edu,* (AZ Bar # 033754)
Diego Ruiz Cruz**
Aliza Lewis**
111 E Taylor St, Mail Code 8820
Phoenix, AZ 85004
(480) 727-7398
*Certified supervising attorney pursuant to L.R. Civ. 83.4(e)
**Certified limited practice student pursuant to L.R. Civ. 83.4(e)
*Attorneys for Plaintiff*

<div align="center">

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

</div>

| | |
|---|---|
| N.M., a minor, by and through his father, Curtis Merrill, and his mother, Karalee Merrill,<br><br><div align="center">*Plaintiff;*</div><br>v.<br><br>Marana Unified School District; Caitlyn Kauffman, in her individual capacity; Kristin Reidy, in her individual capacity; Robin Meece, in her individual capacity; Joshua Bayne, in his individual capacity; and Daniel Streeter, in his individual capacity;<br><br><div align="center">*Defendants.*</div> | CASE NO. CV-25-00377-TUC-EJM<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES; DEMAND FOR JURY TRIAL** |

<div align="center">

**<u>INTRODUCTION</u>**

</div>

1. Schools must educate children while trying to prevent violence on campus;

students pursue their education while violence looms.

2. Schools' efforts to prevent harm can lead to overzealous regulation of students' speech and actions, resulting in violation of their civil liberties.

3. This case arises from such overzealous regulation, in which Defendants' desire to prevent violence led to a decision to unconstitutionally police a student's speech about violence, even when that speech occurred off campus and regardless of whether it posed a credible threat to the school.

4. N.M. was at home with his family when he opened his school-issued laptop to write an email to his English teacher asking for clarification of a grade. N.M.'s mother, Karalee Merrill ("Karalee"), was with him and watching his laptop. N.M. began goofing around with his mother and typed several jokes—including "Mister mister I want to date your sister," "Skibidi toilet my grade is in the toilet," and "GANG GANG GIMME A BETTER GRADE OR I SHOOT UP DA SKOOL HOMIE,"—none of which he sent, all of which he deleted within seconds.

5. But Marana High School ("Marana" or "the School"), was immediately notified of N.M.'s draft email by Gaggle, a subscription, AI-based safety management software program that monitors students' keystrokes on their laptops.

6. Caitlyn Kauffman ("Kauffman" or "Principal Kauffman"), Marana's Principal, called Karalee, who told Kauffman that N.M. was with her, had written the email as a joke, had not sent it, and had never intended to send it.

7. Despite having no reason to believe that N.M.'s speech posed a credible threat to the School, its students, or staff, and not treating it as such—not evacuating the school,

warning parents or students, or taking any other action to indicate she thought the school was actually threatened Kauffman suspended N.M. for 10 days for "threatening or intimidating." Robin Meece ("Meece" or "Hearing Officer Meece") extended N.M's suspension to 45 days following a long-term suspension hearing.

8. While public schools can, under some circumstances, punish students for off-campus speech, the special characteristics of off-campus speech mean that "the leeway the First Amendment grants to schools [to regulate student speech]… is diminished" when it occurs off campus. *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 190 (2021).

9. The *Mahanoy* court declined to "set forth a broad, highly general rule stating just what counts as 'off campus' speech[,]" noting that "determin[ing] precisely which of many school-related off-campus activities belong on such a list" is particularly difficult "given the advent of computer-based learning[.]" *Id.* at 189. Accordingly, all off-campus speech is accorded the same treatment and must pass the same First Amendment test. *Id.*

10. The 9th Circuit has articulated a three-factor test for "determin[ing], based on the totality of the circumstances, whether [off-campus] speech bears a sufficient nexus to the school" to allow regulation[.]" *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 707 (9th Cir. 2019).

11. This test—which remains in effect post-*Mahanoy*, *see Chen Through Chen v. Albany Unified Sch. Dist*, 56 F.4th 708, 720 (9th Cir. 2022)—is flexible and fact-specific, focusing on relevant considerations that include "(1) the degree and likelihood of harm to

the school caused or augured by the speech, (2) whether it was reasonably foreseeable that the speech would reach and impact the school, and (3) the relation between the content and context of the speech and the school." *McNeil*, 918 F.3d at 707.

12. Applying this test to a potential threat of school violence, the *McNeil* court held that a school may not take disciplinary action in response to "just any perceived threat of school violence arising from off-campus speech[,]" but may only do so if the speech bears a sufficient nexus to the school. *See Id.* at 707-9. Such a sufficient nexus exists when a school "reasonably determines that it faces an identifiable and credible threat of school violence" arising from off-campus speech. *Id.* at 708.

13. The *McNeil* court emphasized this point—that a school cannot regulate off-campus speech that does not raise an identifiable and credible threat—in speaking approvingly of *Porter v. Ascension Parish Sch. Bd.,* in which the 5th Circuit found that a student's violent drawing could not subject him to school discipline because "the drawing was two years old, highly fantastical, unspecific, and unaccompanied by other indicia of a violent intent[, t]here was no evidence [the student] had ever had the capacity to carry out the actions depicted in the drawing… [and] it was unlikely that any reasonable administrator could have believed the school faced a credible safety threat." 393 F.3d 608 (5th Cir. 2004) (citations omitted). *See McNeil*, 918 F.3d at 709.

14. N.M.'s speech did not raise an identifiable and credible threat of violence nor cause or augur any disruption to the School.

15. Accordingly, notwithstanding school officials' profound interest in preventing school violence, N.M. had a First Amendment right to make a joke about school violence while at home with his mother.

16. N.M., by and through his parents, brings this suit to remedy the loss of his rights.

## JURISDICTION AND VENUE

17. This action to vindicate N.M.'s rights protected by the First and Fourteenth Amendments of the United States Constitution is brought under 42 U.S.C. § 1983 and 1988. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1343. This court has the authority to issue declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 2202.

18. Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because the Defendants each reside and/or perform official duties within this District and the events or omissions giving rise to N.M.'s claims occurred in this District.

## PARTIES

19. N.M. is a minor child who will begin his junior year at Marana High School in August 2025. N.M. is a resident of Pima County, Arizona.

20. Karalee Merrill is N.M.'s mother. Karalee Merrill brings this action on behalf of her minor son, N.M.

21. Curtis Merrill ("Curtis") is N.M.'s father. Curtis Merrill brings this action on behalf of his minor son, N.M.

22. Defendant Marana Unified School District ("the District") is located in Marana, Arizona. The District includes Marana High School, a public high school in Marana, Arizona.

23. Defendant Caitlyn Kauffman is an adult resident of Arizona. At all times relevant to the events described in this Complaint, Kauffman was employed by the District as Principal at Marana High School and was acting under color of state law by the District's authority. Kauffman is sued here in her personal capacity.

24. Defendant Kristin Reidy ("Reidy" or "Assistant Superintendent Reidy") is an adult resident of Arizona. At all times relevant to the events described in this Complaint, Reidy was employed by the District as Assistant Superintendent for Educational Services and was acting under color of state law by the District's authority. Reidy is sued here in her personal capacity.

25. Defendant Robin Meece is an adult resident of Arizona. At all times relevant to the events described in this Complaint, Meece was employed by the District as a Hearing Officer and was acting under color of state law by the District's authority. Meece is sued here in her personal capacity.

26. Defendant Joshua Bayne ("Bayne" or "Executive Director Bayne") is an adult resident of Arizona. At all times relevant to the events described in this Complaint, Bayne was employed by the District as Executive Director of State and Federal Programs and was acting under color of state law by the District's authority. Bayne is sued here in his personal capacity.

27. Defendant Daniel Streeter ("Streeter" or "Superintendent Streeter") is an adult resident of Arizona. At all times relevant to the events described in this Complaint, Streeter was employed by the District as Superintendent and was acting under color of state law by the District's authority. Streeter is sued here in his personal capacity.

## FACTUAL ALLEGATIONS

28. N.M. was a sophomore at Marana during the 2024-2025 school year.

29. After his freshman year, N.M. had the highest grade point average in his class.

30. N.M. is a member of Marana's Academic Decathlon teams, is active in his church youth group, referees for youth soccer leagues, is a Cadet Senior Airman in the Davis Monthan Composite Squadron of the Civil Air Patrol, and takes flight lessons on the weekends, with the goal of earning his Private Pilot License for Gliders.

31. Curtis Merrill and Karalee Merrill are the natural parents of N.M.

### *N.M. types the draft email*

32. On October 9, 2024, N.M. was sitting with Karalee as she got herself and N.M's siblings ready for the day.

33. N.M. did not plan to attend school that day because Marana's Fall Break was starting the next week and teachers had planned parties during class time.

34. N.M. asked Karalee for advice about an English assignment on which he received a poor grade.

35. Karalee advised N.M. to email his teacher asking how he could raise his grade or whether he could resubmit the assignment.

36. N.M. felt awkward initiating a conversation with his teacher about a poor grade and sought Karalee's help.

37. N.M. typed his teacher's email address and "Revise Journal" in the subject line but could not decide what to write in the body of the email.

38. N.M. started goofing around with Karalee by saying and typing jokes such as "Mister mister I want to date your sister" and "Skibidi toilet my grade is in the toilet."

39. N.M. typed each joke, narrated it humorously to Karalee, and deleted it within seconds.

40. N.M. then typed, "GANG GANG GIMME A BETTER GRADE OR I SHOOT UP DA SKOOL HOMIE."

41. N.M. narrated this joke to Karalee in a silly voice.

42. Karalee told him to delete the email so that he did not accidentally send it to his teacher.

43. N.M. immediately deleted the message and closed his laptop, never finishing or sending the email.

### *Principal Kauffman suspends N.M. for ten days*

44. Within an hour of N.M. closing his laptop, Karalee received a call from Principal Kauffman and School Resource Officer Michael Abrigo asking about N.M.'s location, because he was not in class and they were concerned about a possible threat.

45. Principal Kauffman explained that she had received a Gaggle notification concerning N.M.'s Chromebook use.

46. Gaggle is a subscription, AI-based safety management software program that Marana uses to flag concerning content in students' school-issued accounts and see early warning signs so they can take action to protect students from harming themselves or others.

47. A photograph of N.M.'s screen, showing his draft email, was included in the Gaggle notification received by Principal Kauffman.

48. Karalee immediately knew the reason for Principal Kauffman's call, recalling N.M.'s joking emails.

49. Karalee explained what happened: that N.M. was at home, was with her when he typed the draft email, had been joking, and did not send or intend to send the email.

50. Karalee also shared that neither she nor N.M. knew his keystrokes were being tracked or that anyone could see the draft email.

51. Karalee felt that this explanation calmed Principal Kauffman's nerves and assured her there was no credible threat to the school's safety.

52. Principal Kauffman proceeded to read N.M.'s email draft word for word: "GANG GANG GIMME A BETTER GRADE OR I SHOOT UP DA SKOOL HOMIE."

53. After further discussing the situation and confirming N.M. posed no threat, Principal Kauffman said she would call Karalee later that day with more information.

54. That evening, Principal Kauffman left Karalee a voicemail in which she apologized for not calling back sooner and said she "wanted to have the opportunity to speak to my boss, my assistant superintendent who supports us with discipline."

55. On information and belief, Principal Kauffman spoke to Assistant Superintendent Reidy.

56. Principal Kauffman informed Karalee that, "after talking to [Assistant Superintendent Reidy]," it was determined N.M. would be suspended for ten days "for using a school device to write about shooting up the school" and that he would have a long-term suspension hearing during his initial ten-day suspension.

57. Principal Kauffman said that, because N.M. had "never been in trouble and was a good student typically," the District would recommend at the long-term suspension hearing an "eleven-day suspension with some counseling." Principal Kauffman finally "apologiz[ed] for this news" but reiterated that it was "for the using of the school device in writing about the school shooting."

58. After receiving Principal Kauffman's voicemail, Curtis Merrill called Kauffman to discuss N.M.'s punishment.

59. In this call, Principal Kauffman acknowledged N.M.'s lack of disciplinary actions, his "very good school record," and that this was merely a "mistake" on N.M.'s part, but explained that the suspension would not be changed.

60. At no point did Principal Kauffman or anyone else from Marana or the District speak with or try to contact N.M.

### *Hearing Officer Meece finds that N.M. violated the District's Threatening or Intimidating Policy*

61. On October 28, 2024, the District held a long-term suspension hearing.

62. Present at the hearing were Hearing Officer Meece, Principal Kauffman, Curtis, Karalee, and N.M.

63. The hearing was to determine whether N.M. had violated the District's Comprehensive Student Discipline Policy: Matrix #21, Threatening or Intimidating.

64. Hearing Officer Meece began the hearing by asking Principal Kauffman to present the District's evidence against N.M.

65. Principal Kauffman testified regarding the events described herein.

66. Principal Kauffman presented no other evidence or witnesses.

67. Principal Kauffman did not allege that N.M.'s draft email presented an identifiable and credible threat of school violence.

68. After Principal Kauffman's testimony, Hearing Officer Meece immediately turned to questioning N.M. about the charges.

69. Hearing Officer Meece asked N.M. if what Principal Kauffman stated was "pretty much what was going on."

70. Hearing Officer Meece told N.M., "You're aware, like, at schools, we can't be writing those kind of things, or talking about those things at all, right?"

71. Hearing Officer Meece questioned N.M. for approximately one minute.

72. Without giving N.M. an opportunity to speak further, Hearing Officer Meece asked Curtis and Karalee if there was anything they wanted to add.

73. Curtis and Karalee explained the circumstances surrounding the draft email.

74. Following Curtis and Karalee's statements, Principal Kauffman presented the District's recommendation that N.M. be suspended for forty-five days, to include the ten

days currently being served, with the suspension reduced to eleven days if N.M. completed three counseling sessions.

75. Hearing Officer Meece agreed with the District's recommendation and found that N.M. violated Matrix #21, Threatening or Intimidating.

76. Hearing Officer Meece imposed a forty-five day suspension with the possibility of a reduction to eleven days if N.M. completed three counseling sessions.

77. Hearing Officer Meece told N.M. that the counseling sessions were not to address any violent propensity of N.M. and do not even "have to relate directly to anything here."

78. The hearing concluded without N.M., Curtis, or Karalee having the opportunity to ask Principal Kauffman any questions.

### *Executive Director Bayne affirms N.M.'s suspension*

79. On October 31, 2024, N.M. appealed Hearing Officer Meece's decision.

80. On November 6, 2024, an appeal meeting took place at which Curtis and Karalee shared with Executive Director Bayne their concerns, including that N.M. was denied due process and that his draft email was not an actual threat.

81. On November 11, 2024, Executive Director Bayne issued a letter affirming N.M.'s forty-five day suspension, with the suspension reduced to eleven days if N.M. completed three counseling sessions.

82. In support of his decision, Executive Director Bayne claimed that "[N.M.'s] subjective intent does not change the fact that it was reasonable to foresee that [his]

words would cause fear in others… [N.M.'s] words did have a reasonable effect to inflict fear or realize personal gain (i.e., a better grade)."

### *Superintendent Streeter affirms N.M.'s suspension*

83. On November 20, 2024, N.M. appealed Executive Director Bayne's decision.

84. On December 5, 2024, Superintendent Streeter issued a letter affirming N.M.'s suspension but modifying the length of N.M.'s suspension to nine days.

85. This modification served little value to N.M., since he had already served an eleven-day suspension and completed two counseling sessions.

86. In support of his decision, Superintendent Streeter claimed that N.M.'s suspension was warranted because "[t]he hearing officers have relied on the [District's] definition of [threat/intimidation] as 'verbal, written or physical communications *or acts* made with the intent or *reasonable effect* to inflict fear, injury or damage or to realize personal gain'" (emphasis in original).

### *Defendants did not believe N.M. posed a credible threat*

87. N.M. was allowed to return to campus during his suspension to take the PSAT, after which he waited unsupervised on campus for Karalee to pick him up.

88. When he returned to school, N.M.'s teachers and classmates were unaware he had been suspended for "threatening" the school, and N.M. faced no questions from teachers or restrictions on his activity.

89. After returning to school, N.M. never spoke with administrators, teachers, school counselors, or the School Resource Officer about his mental health, propensity for violence, access to guns, or desire to "shoot up" the school.

90. Defendants' policy of disciplining students for off-campus jokes—regardless of whether those joke impacted the school—is evidenced by a "Safety Update" Principal Kauffman sent to the Marana community on September 17, 2024, that stated:

> I also need us to work together to educate our students about the seriousness of making jokes about guns, violence at school, or about people… students must understand that making jokes or statements about guns and violence involving schools and/or people will result in significant consequences. This ranges from long-term suspension to expulsion… These statements can be life-changing for a student, but also can negatively impact the students around them. Students feeling comfortable making statements about hurting others will not be tolerated at Marana High School.

91. Defendants disciplined N.M. as a result of their well-intentioned but overzealous policy of policing students' speech about guns and violence, regardless of whether that speech occurred at home, presented a credible threat of violence, and caused or augured any disruption to the school.

## CLAIM ONE

### Violation of the First and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983 (Freedom of Speech) (Against All Defendants)

92. N.M. re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

93. The right to free speech and expression under the First Amendment to the United States Constitution includes the right of students to speak without interference by

their school when they are at home, so long as the speech does not bear a sufficient nexus to the school.

94. N.M. was engaged in a constitutionally-protected activity when he typed a joke at home about "SHOOT[ING] UP DA SKOOL HOMIE."

95. N.M. typed the joke in a draft email, at home, in front of his mother, and did not send or intend to send it.

96. After receiving a Gaggle notification about N.M.'s speech, Principal Kauffman called Karalee, who explained that she had been with N.M. when he typed the draft email, that it was a joke, and that N.M. did not send or intend to send it.

97. Principal Kauffman knew or should have known that N.M. was an excellent student with no disciplinary record, that there were no indicia of violent intent, and that there was no evidence N.M. had the capacity to carry out the actions described in the draft email.

98. Principal Kauffman determined, in consultation with Assistant Superintendent Reidy, that N.M. had violated the District's Threatening or Intimidating Policy and suspended N.M. for ten days, subject to extension at a long-term suspension hearing.

99. At the ensuing long-term suspension hearing, Hearing Officer Meece determined that N.M. violated the District's Threatening or Intimidating Policy and suspended N.M. for 45 days.

100. N.M. appealed the suspension per the procedure described in the District's Comprehensive Student Discipline Policy.

101. Executive Director Bayne reviewed N.M.'s appeal, determined that N.M. violated the District's Threatening or Intimidating Policy, and upheld N.M.'s 45-day suspension.

102. N.M. appealed Executive Director Bayne's decision per the procedure described in the District's Comprehensive Student Discipline Policy.

103. Superintendent Streeter reviewed N.M.'s appeal, determined that N.M. violated the District's Threatening or Intimidating Policy, and reduced the length of N.M.'s suspension to nine days.

104. Superintendent Streeter had final policymaking authority from the District with respect to the interpretation and application of the District's disciplinary policies.

105. The District is liable for Kauffman, Reidy, Meece, Bayne, and Streeter's violations of N.M.'s rights because Superintendent Streeter was acting as the final policymaker for the District when he interpreted and applied the Threatening or Intimidating Policy to prohibit speech protected by the First Amendment,

106. Superintendent Streeter also ratified Kauffman, Reidy, Meece, and Bayne's decisions finding that N.M. violated the Threatening and Intimidating Policy; that is, Superintendent Streeter knew of and made a deliberate choice to approve Kauffman, Reidy, Meece, and Bayne's decisions and the basis for them.

107. Superintendent Streeter's actions as final policymaker caused the deprivation of N.M.'s rights, because they were so closely related to the deprivation of N.M.'s rights as to be the moving force that caused N.M.'s ultimate injury.

108. The District is also liable for Kauffman, Reidy, Meece, Bayne, and Streeter's violations of N.M.'s rights because they each acted pursuant to an expressly adopted official policy, or a widespread or longstanding practice or custom, of the District in interpreting the District's Threatening or Intimidating Policy to prohibit speech that is protected by the First Amendment.

109. This official policy or widespread practice or custom is demonstrated by the fact that none of Kauffman, Reidy, Meece, Bayne, or Streeter considered the credibility of N.M.'s "threat," nor its impact or foreseeable impact on the School, when they determined that N.M. had violated the Threatening or Intimidating Policy.

110. The District's official policy, or widespread or longstanding practice or custom, caused the deprivation of N.M.'s rights by Kauffman, Reidy, Meece, Bayne, and Streeter; that is, the District's official policy or widespread or longstanding practice or custom is so closely related to the deprivation of N.M.'s rights as to be the moving force that caused N.M.'s ultimate injury.

111. Defendants' actions would chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment.

112. Defendants' actions were substantially motivated by N.M. engaging in activity protected by the First Amendment.

113. At all relevant times, Defendants acted under color of state law.

114. Defendants Kauffman, Reidy, Meece, Bayne, and Streeter acted willfully, maliciously, and with reckless disregard for N.M.'s constitutional rights.

115. As a direct and proximate result of Defendants' unlawful actions as alleged herein, N.M. was and continues to be deprived of his constitutional right to freedom of speech, suffered emotional distress and financial damages, and fears further mistreatment should he engage in protected speech.

## **CLAIM TWO**

**Violation of the Fourteenth Amendment of the United States Constitution under 42 U.S.C. § 1983 (Procedural Due Process) (Against Defendants Caitlyn Kauffman, Robin Meece, and Marana Unified School District)**

116. N.M. re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

117. Public schools are not free from notice and hearing requirements under the Fourteenth Amendment to the United States Constitution.

118. Students facing temporary suspensions of ten days or less must be given notice of the charges, an explanation of authorities' evidence, and an opportunity to present their side of the story. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975).

119. These protections exist because, while schools are "vast and complex… [and] may well prefer the untrammeled power to act unilaterally, unhampered by rules about notice and hearing[,] [] it would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done." *Id.* at 580.

18

120. While this hearing need only be an "informal[] discuss[ion] of the alleged misconduct with the student minutes after it has occurred[,]" *Id.* at 582, N.M was denied even that, as Principal Kauffman never spoke with him before she imposed a ten-day suspension.

121. After receiving a Gaggle notification about N.M.'s draft email, Principal Kauffman called Karalee to inquire about N.M.'s whereabouts.

122. On that call, Principal Kauffman spoke with Karalee but not N.M.

123. Principal Kauffman never spoke with N.M. before she imposed a ten-day suspension.

124. Principal Kauffman did not speak with N.M. until his long-term suspension hearing on October 28, 2024, by which point he had served his entire initial ten-day suspension.

125. The simplicity and ease with which schools may comply with this requirement does not countenance violations, for these requirements are "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id.* at 581.

126. A student may be immediately removed from school, without notice and hearing, where his "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process... [but i]n such cases, the necessary notice and rudimentary hearing should follow as soon as practicable[.]" *Id.* at 582.

127. N.M. was at home when he was suspended by Principal Kauffman, and so did not need to be immediately removed from school without notice and hearing.

128. Regardless of whether Principal Kauffman believed N.M.'s suspension required immediate action to prevent a danger to the school, she never followed up with him to let him tell his side of the story.

129. Principal Kauffman failed to follow the District's Comprehensive School Discipline Policy: Short-Term Suspension (Grades 5-12), which requires that

> Step 1.  As soon as possible following the alleged infraction, the appropriate building administrator must give the student, in an informal conference, oral or written notice of the alleged misconduct.
> a.  If the student denies the allegation, the evidence will be explained to the student.
> b.  The student will be allowed to present his/her own version of the situation.

130. Even in the case of an "Emergency Suspension," the District provides that "[t]he due process procedures described for a short term suspension must be provided <u>as soon as practicable</u> following the removal of a student under emergency conditions" (emphasis in original).

131. For a suspension longer than 10 days, Due Process requires additional safeguards, including that a student have a hearing at which he may be represented by counsel, present witnesses on his own behalf, and cross-examine adverse witnesses. *Black Coalition v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973).

132. At his long-term suspension hearing, N.M. did not have the opportunity to cross-examine adverse witnesses.

133. Principal Kauffman testified against N.M.

134. Principal Kauffman and the District presented no other evidence or witnesses.

135. Hearing Officer Meece never gave N.M. or his parents the opportunity to cross-examine Principal Kauffman.

136. Hearing Officer Meece failed to follow the District's Comprehensive School Discipline Policy: Long-Term Suspension, which requires that

> Step 4.  The following guidelines shall be observed at the formal hearing:
> …
> c.  The person who imposed the short-term suspension, or his or her representative, shall be allowed to submit evidence, present witnesses, and testify against the student.
> …
> e.  The student, or the student's representative, has the right to question all the witnesses.

137. After Principal Kauffman and Hearing Officer Meece failed to observe constitutional requirements and District policy, N.M appealed his suspension to Executive Director Bayne and Superintendent Streeter.

138. In spite of Kauffman and Meece's failure to observe constitutional requirements and District policy, Superintendent Streeter determined that "there were no procedural errors throughout the discipline or appeal process" and upheld N.M.'s suspension.

139. Superintendent Streeter had final policymaking authority from the District with respect to the interpretation and application of the District's disciplinary policies.

140. The District is liable for Kauffman and Meece's violations of N.M.'s rights because Superintendent Streeter was acting as the final policymaker for the District when he ratified Kauffman and Meece's actions that violated N.M.'s Due Process rights; that is,

Superintendent Streeter knew of and made a deliberate choice to approve Kauffman and Meece's decisions despite their procedural errors.

141. Superintendent Streeter's actions as final policymaker caused the deprivation of N.M.'s rights, because they were so closely related to the deprivation of N.M.'s rights as to be the moving force that caused N.M.'s ultimate injury.

142. At all relevant times, Defendants acted under color of state law.

143. Defendants Kauffman and Meece acted willfully, maliciously, and with reckless disregard for N.M.'s constitutional rights.

144. As a direct and proximate result of Defendants' unlawful actions as alleged herein, N.M. was and continues to be deprived of his constitutional right to freedom of speech, suffered emotional distress and financial damages, and fears further mistreatment should he engage in protected speech.

## **PRAYER FOR RELIEF**

WHEREFORE, N.M. respectfully requests from this Court:

A. A declaratory judgment that Defendants' conduct complained of herein violated N.M.'s rights under the United States Constitution;

B. A permanent injunction expunging from N.M.'s educational records any reference to the suspension, disciplinary proceedings, and circumstances surrounding the same, complained of herein;

C.  A permanent injunction restraining Defendants from enforcing its Comprehensive School Discipline Policy in violation of students' rights under the United States Constitution;

D.  An award of general and compensatory damages for N.M. from Defendant Marana Unified School District for the violation of N.M.'s rights under the United States Constitution, including but not limited to pain, suffering, emotional distress, and costs to be determined according to proof;

E.  An award of general, compensatory, and punitive damages for N.M. from Defendants Caitlyn Kauffman, Kristin Reidy, Robin Meece, Joshua Bayne, and Daniel Streeter for the violation of N.M.'s rights under the United States Constitution, including but not limited to pain, suffering, emotional distress, and costs to be determined according to proof;

F.  An award of attorney's fees pursuant to 42 U.S.C. § 1988;

G.  An award of costs as permitted by law;

H.  Pre- and post-judgment interest as permitted by law; and

I.  Such other and further relief as the Court may deem just and proper.

DATED this 16th day of July, 2025.

/s/ Aaron Baumann
Gregg P. Leslie
Aaron A. Baumann
Aliza Lewis
Diego Ruiz Cruz
Public Interest Law Firm
Sandra Day O'Connor College of Law

Arizona State University
*Attorneys for Plaintiff*